574 P.2d 830

**The STATE of Arizona, Appellee,**

v.

**Glenn M. DONAHOE, Victor Charles Papadinis, Ronald C. Lovell, Appellants.**

**Nos. 2 CA–CR 1011–2, 2 CA–CR 1015 and 2 CA–CR 1019.**

Court of Appeals of Arizona, Division 2.

Oct. 6, 1977.

Rehearing Denied Dec. 8, 1977.

Review Denied Jan. 4, 1978.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, and Steven D. Sheldon, Asst. Attys. Gen., Phoenix, for appellee.

Harley Kurlander, Tucson, for appellant Donahoe.

Stolkin, Weiss & Tandy by Stephen M. Weiss, Tucson, for appellant Papadinis.

Benjamin W. Lazarow, P. C. by Benjamin W. Lazarow, Tucson, for appellant Lovell.

## OPINION

HOWARD, Chief Judge.

Appellants were indicted for conspiracy to possess marijuana, unlawful possession of marijuana for sale and unlawful transportation of marijuana. After a bench trial, appellant Donahoe was found not guilty of the conspiracy and transportation charges, but was convicted of unlawful possession of marijuana for sale. He was sentenced to not less than eight years nor more than ten years in the Arizona State Prison and ordered to pay a fine of $10,000. Appellant Lovell was convicted of unlawful possession of marijuana for sale and appellant Papadinis was found guilty of unlawful transportation of marijuana. Both Lovell and Papadinis were found not guilty of the balance of the charges. Imposition of their sentences was suspended, they were placed on probation for ten years and were ordered to pay fines.

The record shows that Agent Patrick Malloy, of the Arizona Department of Public Safety had received information and read reports from agents of the Federal Drug Enforcement Agency which indicated that Donahoe was a large scale drug dealer. A periodic surveillance of Donahoe's residence was commenced. On Friday, October 17, 1975, Agent Malloy and his partner Agent Rogers while watching Donahoe's residence, observed two pickup trucks with California license plates that were parked at the residence. When one of the pickups departed, the agents began checking addresses that Donahoe frequented. They drove to the residence of Donahoe's grandmother which was located at 4505 N. Fletcha Drive. There they saw a Ryder rental truck parked against the carport and were able to identify the appellants standing at the rear of the truck. Malloy recognized Donahoe because he had seen him approximately six times before. In order to continue their surveillance the agents went to the KIKX radio station on Swan Road which was one-half to one mile away. Malloy called for assistance and when two other agents joined them at the radio station, Malloy and Rogers proceeded to a house across the street from the grandmother's house.

By that time it was dark outside, but through the use of binoculars they were able to see what was going on around the truck since there was a yellow porch light on and a drop light had been attached to the back of the truck. Appellants were in

the rear of the truck and either two or three of them were observed loading four cardboard boxes into a crate. Appellant Lovell got out of the truck and stood near the back while the other appellants remained inside the truck. There were loud pounding and clanging sounds coming from the truck and after a while the doors were closed and the drop light was turned off. At that time the agents heard a voice from the back of the truck say that they were not through yet. The light was then turned on again and there was more banging. Subsequently appellants Papadinis and Donahoe got out of the back of the truck. Papadinis got into the cab of the truck and departed from the residence followed by a green Pontiac driven by Lovell with Donahoe in the passenger side. The truck followed the Pontiac to the Monaco Inn where they pulled into the rear parking lot, side by side and all three appellants got out and went into the Monaco Inn. Lovell came back outside, entered the Pontiac, drove away, returned once more and then departed. At one point he pulled into the rear entrance of the Monaco Inn and someone handed him a package which he took and departed for the Smuggler's Inn.

A person identified as Mr. Allard was observed getting into a white Ford Granada. He left the parking lot and then returned. Papadinis then came out of the hotel, got in the truck and departed followed by Allard in the white Ford Granada. They proceeded down Wilmot Road, followed by Agents Malloy and Rogers. The agents observed that the Ford automobile would drive up right behind the truck and then slow down, letting all the traffic pass, looking over each car as it passed. It would then pull up again close to the truck. The truck stopped at a Texaco station at the corner of Wilmot and Broadway. The car went into the parking lot of an adjacent restaurant. Papadinis got out of the truck, went inside the Texaco station and came back out and got in the truck. He then pulled the truck around to the restaurant parking lot, parking by the Ford.

The two vehicles then proceeded down Wilmot, using the same procedure as before, to-wit, the Ford Granada pulling up close behind the truck and then riding behind and observing all the cars which passed it. They proceeded south on Wilmot Road, and as the truck approached Golf Links Road, it went into the left turn lane. The Ford slowed down waiting for all the vehicles to clear and then pulled over into the left turn lane behind the truck. Both vehicles turned east on Golf Links Rd. to Calle Polar. The car proceeded approximately 100' and stopped while the truck continued on, turning east on 39th St. The truck made a U-turn on 39th. It was now headed in a westerly direction and stopped in the middle of the block. The automobile then joined the truck. Allard and Papadinis got out of the vehicles and had a brief meeting. Papadinis then got back into the truck and pulled into a residence on 39th Street while Allard drove his vehicle across the street and one residence west of the house where Papadinis had stopped. Both drivers alighted and went into the residence at 6641 E. 39th. Three or four minutes later both came out of the house, got into the Ford Granada and departed, leaving the truck at the residence.

The Department of Public Safety then commenced a round-the-clock surveillance of the Ryder truck. No one entered the truck until 7:30 Monday morning when Papadinis came back in the white Ford Granada which was then being driven by a woman. Papadinis went into the house, came back out, went to the car to get some papers, opened the back of the truck and got in. He stayed in the truck for five to ten minutes, came back out and the Ford Granada left. Papadinis got into the cab of the truck and departed. He was followed by agents from the Department of Public Safety to the Time D.C. Trucking Company, a freight company. He pulled into the loading dock and commenced unloading crates from the back of the truck. At this time he was being observed by Agent Richardson. After Papadinis had placed two of the crates on the loading dock, he re-entered the cab of the truck and began to move the vehicle. He was stopped by Sgt.

Richardson, placed under arrest, was read his "*Miranda* Rights" and was transported to D.P.S. headquarters. En route Papadinis stated he knew that what he was doing was illegal but "it wasn't like it was hard drugs". He told the officers he felt marijuana should be legalized and that they couldn't stop the use of it. Sgt. Richardson drove the truck to D.P.S. headquarters. The shipping bill indicated food slicing machinery and steel knock down stands. However, Agent Malloy was of the opinion that the cardboard boxes he had observed being loaded at the Fletcha Drive address did not appear to be the type that would contain that type of machinery.

Agent Malloy obtained a search warrant. There were five 3 × 3 × 3 wooden crates which contained padlocked stainless steel boxes. Inside were the cardboard boxes that Malloy had seen being loaded at the Fletcha Drive address. The cardboard boxes contained 542 bricks of marijuana.

The affidavit in support of the search warrant signed by Agent Malloy, in addition to setting forth the facts we have recited, stated that Agent Ken Sul of the Drug Enforcement Agency (D.E.A.) told him that Donahoe was smuggling marijuana into Arizona from Mexico by aircraft and that on one occasion Donahoe crashed an airplane loaded with marijuana in Mexico. He further stated that on May 23, 1975, a 1971 Chevrolet motor home registered to Glenn Donahoe was seized at the McCracken Mine Air Strip thirty miles southeast of Yucca, Arizona. The motor home contained 1,144 pounds of marijuana which was confiscated and four persons were arrested. The affidavit also recited that Malloy had received information from Agent Mike McBride of D.E.A. that McBride had received information from a confidential and reliable informant that Donahoe was smuggling large quantities of marijuana into Arizona from Mexico by aircraft and that the marijuana was being shipped from Arizona to the New England states area. Also, the affidavit stated that Malloy had been contacted by the Phoenix Narcotics D.P.S. section in reference to Glenn Donahoe.

Further facts will be set forth as they relate to the various questions presented for review.

Appellants claim there was no probable cause to arrest Papadinis, the affidavit supporting the search warrant did not comply with the guidelines set down by the United States Supreme Court in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and the affidavit contained false and misleading information. At the hearing on the motion to suppress Agent Malloy testified that Agent Sul got his information from personal knowledge, informants and reports he had read. Agent McBride from D.E.A. gave Agent Malloy two reports to read. The first report came from a concerned citizen in Mexico who had transported Donahoe to a hospital in Mexico after the airplane crashed in a narcotics haul in that country. This citizen reported the information to a D.E.A. agent. The second report furnished by McBride to Malloy came from a person personally involved with Donahoe in a conspiracy to smuggle marijuana. The information concerning the 1,144 pounds of marijuana seized at an airstrip near Yucca, Arizona, came from an agent of the Department of Public Safety in Phoenix. As to this latter bit of information, appellants claim that it was false since the motor home was not registered to Donahoe but to his wife and the marijuana was not found in the motor home but was found nearby. Furthermore, they claim that the information furnished by the D.E.A. agent was based on information from unreliable informants and therefore cannot be used. We do not agree.

The information Malloy received from the other law enforcement agencies and from D.P.S., coupled with the personal observations which we have previously set forth, justified the arrest of Papadinis. There is probable cause for an arrest if the arresting officer has sufficient knowledge of facts and circumstances to justify a man of prudent and reasonable caution to believe that a felony has been committed.

*State v. Wilson*, 113 Ariz. 145, 548 P.2d 23 (1976). A suspect's reputation has probative value and is not to be excluded when determining probable cause. Cf. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Even if we were to exclude the statement concerning Donahoe's motor home containing 1,144 pounds of marijuana when it was confiscated in Yucca, Arizona, the affidavit still contains sufficient allegations to support a finding of probable cause. See *State v. Sabari*, 109 Ariz. 553, 514 P.2d 474 (1973); *State v. Payne*, 25 Ariz.App. 454, 544 P.2d 671 (1976).

■ Appellants contend that the magistrate who issued the search warrant could not consider the admissions of Papadinis in support of probable cause. We do not agree. The agents testified at the motion to suppress that Papadinis had been informed of his rights and that he responded that he understood those rights. Agent Malloy stated that he was with Papadinis and Officer Anderson continuously from the time of the arrest at the Time D.C. Trucking Company until they arrived at the D.P.S. headquarters. Five minutes after the arrest Papadinis and officers Malloy and Anderson were en route to the D.P.S. headquarters. Agent Malloy admitted that Papadinis had requested an attorney, but stated that no questions were asked after the request. Malloy stated that on the way to D.P.S. headquarters Papadinis asked them what they thought about the marijuana laws. Malloy told Papadinis that it didn't make any difference what they thought about the laws since their duty was to enforce the law. It was at that time that Papadinis made the admission which is contained in the affidavit supporting the search warrant. At the motion to suppress the admission, Papadinis denied making it and also claimed that his *Miranda* Rights were violated. We believe the record supports the trial court's conclusion that the statements were made and were admissible since they were not the result of any police interrogation. There being no manifest error, we do not interfere with the denial of the motion to suppress. *State v. Dugan*, 113 Ariz. 354, 555 P.2d 108 (1976).

■ Appellants Lovell and Papadinis, in addition to being placed on probation, were fined $10,000 and $11,000 respectively. They now contend the trial court lacked jurisdiction to impose the fines. We agree. A.R.S. § 36–1002.10 states:

"In addition to the term of imprisonment provided by law for persons convicted of violating A.R.S. §§ 36–1002 to 36–1002.08, inclusive, the superior court may impose a fine not exceeding fifty thousand dollars for each offense. In no event shall the fine be imposed in lieu of or in substitution for the term of imprisonment provided by law for any of the offenses defined in this article."

The statute is clear and unambiguous. The only time the court can impose a fine for violation of the aforementioned statutes is when the court also sentences the defendant to a term of imprisonment. We are therefore constrained to set aside that part of their sentences which imposes a fine.

■ Appellant Donahoe has presented six additional questions for review. He first contends that there was insufficient evidence to convict him of possession of marijuana for sale. We do not agree. Agent Malloy who had seen Donahoe on six prior occasions identified him as being present at the N. Fletcha Drive address and as being the passenger in the Pontiac which accompanied the load vehicle to the Monaco Inn. Furthermore, Donahoe's grandparents resided at the North Fletcha Drive address. Donahoe presented testimony which, if believed, placed him elsewhere at the crucial time. However, the credibility of these alibi witnesses was for the trier of fact and we find no reason to disturb the trial court's disbelief. *State v. Hunter*, 112 Ariz. 128, 539 P.2d 885 (1975). Evidence is not insufficient simply because testimony is conflicting. *State v. Ballinger*, 110 Ariz. 422, 520 P.2d 294 (1974).

On October 26, 1976, the state made a motion pursuant to Rule 26.7, Rules of Criminal Procedure, for a presentence hearing in order to show aggravating circum-

stances. The hearing was commenced on November 15, 1976. Donahoe claims error was committed at the hearing because of improper admission of hearsay evidence, denial of his right to confront and cross-examine a witness and denial of a continuance.

The purpose of the presentence hearing is to allow a party (1) to show aggravating or mitigating circumstances, (2) to show why sentence should not be imposed or (3) correct or amplify the presentence, diagnostic or mental health reports. To this end, reliable and relevant evidence, including hearsay, may be introduced. Rule 26.7(b), Rules of Criminal Procedure.

The evidence of which appellant complains consists of the testimony of two agents from the D.E.A. Agent D'Uliesse testified that he spoke with an informant by the name of Manson Bent who in March 1975 was arrested in Mexico with 600 pounds of marijuana and who gave statements as to his sources and an organization called "James Bond". Appellant was indicted for his part in this drug deal. Bent also told D'Uliesse that he had met with Donahoe in Tucson in June 1975 and he had traveled to Texas using Donahoe's truck and credit cards. This information was verified by D'Uliesse by inspecting company receipts and determining that Donahoe's name had been forged to them.

Agent D'Uliesse also testified that two persons, a Mr. DeWhitt and Mr. Redwine had told him about appellant. D'Uliesse indicated that they had testified before the federal grand jury. Redwine and DeWhitt had delivered an airplane to appellant who with a person by the name of Walton flew it to Mexico. When the airplane was not returned Redwine, DeWhitt and Hogue came to Tucson in June 1975 to get the plane or the money for it. Redwine and DeWhitt were stopped at Tucson International Airport in June 1975 for weapons violations and cooperated with the D.E.A. Walton was stopped at Tucson International Airport in the plane supposedly lost in Mexico.

D'Uliesse further testified to the following. Reports of investigations and tracings led him to believe appellant owned certain aircraft. An investigation in California showed that appellant had purchased a DC3 airplane. A Twin Beech aircraft was registered in his grandfather's name at a fictitious address in Las Vegas. Appellant claimed to own this Twin Beech aircraft which was the subject of a search and seizure in San Bernadino, California. He and a person named Escoe were arrested in the plane in San Bernadino when marijuana debris was found in it. After the San Bernadino arrest in November 1975 appellant confessed to the California authorities involvement in marijuana trafficking. He told them that he had been trafficking in marijuana to the "James Bond" organization. He also stated that Manson Bent was a "mule" for the "James Bond" organization. Based upon the information given by Donahoe, surveillance was established on "James Bond" in Massachusetts and Bent and Bond were eventually arrested and 1,000 pounds of marijuana were seized. Donahoe stated that he had several aircraft listed under the name of Caballero Realty and generally laid out the "James Bond" organization as described by Bent, Redwine and DeWhitt.

Agent Cropp of the D.E.A. testified that in March of 1975 he spoke with two individuals who told him about Donahoe's activities and further stated that their statements corroborated each other. They told Cropp that between June 1974 and December 1974 they had bought approximately 5,000 pounds of marijuana from Donahoe and distributed it in Tucson. They testified in front of a grand jury concerning their activities with Donahoe. Agent Cropp also testified that in June of 1976 he had received a call from Donahoe's neighbor about a man claiming to be a D.E.A. agent. Later that night two armed men were arrested in Donahoe's neighborhood. One of the men indicated that he had told the neighbor he was a D.E.A. agent in order to get into Donahoe's house. He told Cropp that he was in Tucson to help collect $45,000 from Donahoe.

In *State v. Thomas,* 110 Ariz. 106, 515 P.2d 851 (1973) involving a trial held prior to the promulgation of our present rules of criminal procedure, our Supreme Court held that the rules governing admissibility of evidence at trial including the right to confrontation and hearsay do not apply at a hearing in aggravation. The basis of this was *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949) wherein the United States Supreme Court held that the due process clause of the Fourteenth Amendment does not require that a person who has been convicted after a fair trial be confronted with and permitted to cross-examine witnesses at a hearing in aggravation. This rule was further explained in *Williams v. Oklahoma,* 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959):

> " * * * Once the guilt of the accused has been properly established the sentencing judge, in determining the kind and extent of punishment to be imposed, is not restricted to evidence derived from the examination and cross-examination of witnesses in open court but may, consistently with the Due Process Clause of the Fourteenth Amendment, consider responsible or unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics." 358 U.S. 584, 79 S.Ct. 426.

The Arizona Supreme Court has adopted this language from *Williams v. Oklahoma,* supra, in its Rule 26.7(b). The words "reliable" and "responsible" are synonymous. What constitutes reliable or responsible hearsay is of necessity largely within the discretion of the trial court. It would be inappropriate, if not impossible for an appellant court to define the terms "reliable evidence" or "reliable hearsay". While the extremes may be identifiable and defined, the shades of gray defy definition. The trial judge should not and cannot properly sentence a person in a vacuum. The determination of a proper sentence is undoubtedly one of the hardest tasks confronting the trial judge. Handcuffing the trial judge in this aspect would be detrimental to both society and the defendant. As was stated in *Williams v. People of State of New York,* supra:

> "In addition to the historical basis for different evidentiary rules governing trial and sentencing procedures there are sound practical reasons for the distinction. In a trial before verdict the issue is whether a defendant is guilty of having engaged in certain criminal conduct of which he has been specifically accused. Rules of evidence have been fashioned for criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged. These rules rest in part on a necessity to prevent a time consuming and confusing trial of collateral issues. They were also designed to prevent tribunals concerned solely with the issue of guilt of a particular offense from being influenced to convict for that offense by evidence that the defendant had habitually engaged in other misconduct. A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." 69 S.Ct. 1083.

We believe that the hearsay testimony of Agents Cropp and D'Uliesse was reliable. It came from their own observations, from other law enforcement agencies and was corroborated by other witnesses and documentary evidence. It was corroborated by Donahoe himself who told the probation officer that he had been active in smuggling marijuana in the past for a period of one year and that within that year

period he sold approximately 300 to 400 pounds of marijuana a month. When the trial court gave Donahoe the right to refute the testimony of the agents by making an unsworn statement to the court, the following took place:

"Q. (BY MR. LACEY) Mr. Donahoe, you heard the testimony yesterday of Agent D'Uliesse concerning the numerous activities in which he alleged that you were involved. Without going into any specifics at all, do you have a statement that you would like to make to the accuracy of many of the statements made by Mr. D'Uliesse?

A. Yes, I say that ninety-five percent of it was inaccurate. And I imagine most of it is a matter of record.

(MR. LACEY) I have nothing further your Honor.

(MR. FREY) May I have a little unsworn cross-examination, your Honor?

(THE COURT) Sure.

(BY MR. FREY) Q. Mr. D'Uliesse testified yesterday, sir, about some details of an airplane, some vague details of an airplane crash in 1974. Did you hear that testimony, sir?

A. Your Honor, I am going to take your advice and request my counsel to, I don't want to answer any further questions.

(MR. LACEY) Your Honor, at this time I am going to advise my client to claim the Fifth Amendment rights and not to make any further statements. He put in question, I think, the accuracy of the statements. I would then ask the Court I be allowed—

(THE COURT) I. think putting in question the accuracy is a joke, and I think you are making fun of the Court, Mr. Lacey, when somebody gets up and says ninety-five percent inaccurate and won't be cross-examined and won't tell us. I am interested in finding out whether this man is an eligible candidate for probation, and to come with this statement not under oath and ask me to—

(MR. LACEY) Your Honor, I sincerely apologize to the Court. Mr. Donahoe in-

dicated to me that many of the statements that were made yesterday by Mr. D'Uliesse were inaccurate.

(THE COURT) Let him say so under oath if he wants to and let him be subject to cross-examination, and if he is not willing to get up—with this kind of a crack he is making a joke of the Court and the hearing. I am here to determine whether he is a good candidate for probation, and that doesn't tell me a thing, absolutely nothing. . . .

(MR. LACEY) Your Honor, I beg the indulgence of the Court. I am at a loss to try and refute the accuracy of many of those things, as I've indicated to the Court. Mr. Donahoe has indicated to me that many of the things that were testified to by Mr. D'Uliesse are inaccurate. I have not had time to sit down with Mr. Donahoe, go through point by point by point those matters which he considers to be inaccurate.

(THE COURT) I went through the testimony point by point by point and took notes, and I know what I have here. And I don't see why you couldn't take the same amount of time and effort for your client.

(MR. LACEY) I was doing research on other matters which I felt were going to come up today."

We do not believe the court's characterization of Donahoe's testimony to be an overstatement.

Appellant Donahoe claims he was improperly denied the right to cross-examine D'Uliesse. This contention is based upon the following. After the state presented the witness' testimony, counsel for Donahoe began his cross-examination. This consisted of detailed questioning regarding the incidents testified to by D'Uliesse followed by inquiry as to whether D'Uliesse had made a report concerning the incident. If there was an affirmative answer, Donahoe's counsel then demanded to see a copy of the report in order to test the accuracy of D'Uliesse's testimony. These requests were denied. The cross-examination brought up names and incidents not testified to on di-

**46**

rect examination. After about 50 minutes of this cross-examination the state asked the trial court to limit defense counsel to one more hour of cross-examination. The court granted the request noting that the cross-examination up to that point had elicited nothing of value and had in fact hurt Donahoe.

The state answers appellant's contention by reciting the rule of *State v. Thomas*, supra, to-wit, the right of confrontation in cross-examination does not apply to aggravation or mitigation hearings. The state misconceives the law. While it is true that the right does not apply to the presentence hearing, this rule is not applicable once the state has produced a witness and allows him to testify. Under such circumstances the right to cross-examination exists and it may not be unduly restricted. *State v. Hanley*, 108 Ariz. 144, 493 P.2d 1201 (1972). If there is a denial of the right of cross-examination without waiver, it would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it. *Brookhart v. Janis*, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966).

However, in dealing with these reports we are not concerned with denial of a right to cross-examination but rather with the defendant's right to discovery. The failure to allow discovery of a witness' report after the witness has testified can be harmless error. See *People v. Conrad*, 41 Ill.2d 13, 241 N.E.2d 423 (1968). The Jencks Act and the decision of *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), which required the prosecution to produce the statements of the witnesses after the witnesses had testified is not cast in constitutional terms but merely states rules of evidence governing federal criminal prosecution. *Mahone v. State*, 120 Ga.App. 234, 170 S.E.2d 48 (1969). *State v. Kahinu*, 53 Haw. 536, 498 P.2d 635 (1972); *State v. Cryer*, 262 La. 575, 263 So.2d 895 (1972). A judge is not required to follow the strict rules of evidence in mitigation and aggravation hearings, but such hearings must be conducted consistent with

basic concepts of fairness, justice and impartiality. *State v. Hanley*, supra. Some courts hold that production of a police report to be used to cross-examine an officer will not be ordered unless the defendant can show that the report is inconsistent with the officer's testimony. *State v. Cryer*, supra. We do not believe that reason supports such a rule. How is the defendant to know if there are inconsistencies unless he first sees the report? However, we believe that in view of Donahoe's admission to his probation officer of his involvement in marijuana trafficking, the error was harmless. This reasoning applies equally to Donahoe's contention that he should have been granted a continuance in order to call as witness the informant D'Uliesse had mentioned as a source of his information and the various sources of information referred to by Cropp. At no time did Donahoe deny that he told the probation officer about his heavy involvement in marijuana trafficking. If there were any error in denying the continuance, which is left to the sound discretion of the trial court, it was harmless. It should also be noted that Donahoe made no offer of proof to show what testimony he would elicit from these witnesses.

Appellant Donahoe claims he should be resentenced because the court failed to follow Rule 26.6(c), Rules of Criminal Procedure. This rule states that the court may excise items from the copy of the presentence report disclosed to the parties, including sources of information obtained on the promise of confidentiality and information which would disrupt an existing police investigation. The presentence report disclosed to appellant stated that there were non-disclosed items, apparently information which would disrupt an existing police investigation. The rule states that when a portion of the presentence report is not disclosed the court shall inform the parties and shall state on the record the reasons for the excision. The court did not do so in this case. However, the presentence report clearly states why the matter was excised. We have examined the non-

disclosed items and find that the presentence report is incorrect in stating that it was excised due to an ongoing police investigation. It was excised under Rule 26.-6(c)(2) which provides for excision of sources of information obtained on a promise of confidentiality. But most importantly, the matter contained in this non-disclosed item was fully covered in the testimony of Agents D'Uliesse and Cropp. Thus no error can be claimed.

After appellant Donahoe had been sentenced, he filed a motion to vacate the judgment which was in reality a motion to vacate the sentence. He alleged that improper conduct had occurred in the Pima County Probation Department which in turn biased a report to the sentencing judge. He also filed a motion for a change of judge for cause pursuant to Rule 10.1 of the Rules of Criminal Procedure in order to disqualify Judge Fisher from hearing his motion to vacate. The motion for change of judge came before Judge Druke of the Pima County Superior Court. He felt that the motion to vacate the "judgment" should be heard by Judge Fisher and refused to proceed on the motion for a change of judge. However, he did allow Donahoe to make an offer of proof on the motion for change of judge. The motion to vacate the "judgment" was subsequently heard by Judge Fisher who denied it.

Judge Druke's failure to rule on the motion for change of judge, appellant claims, is reversible error. We do not agree. The offer of proof disclosed that a member of the adult probation department was related by marriage to Donahoe. Curtis Gustafson, a member of the adult probation department, was related in that Donahoe had been married to the sister of Gustafson's wife. The examination of the witness also indicated that the probation officer who made the probation report, Craig Lunsberg, had spoken with adult probation officer Ward, who had in turn on one occasion, received information from Gustafson concerning the death of appellant's wife. The evidence also indicated that Judge Fisher was not aware that a custody case was pending. nor

was any disclosure made to the trial judge regarding the relationship between Gustafson who was in the social services department of the adult probation office, and appellant's deceased wife's sister. This proffered testimony did not show actual bias, hostility or ill will on the part of Judge Fisher that would prevent impartial justice being done. Appellant having failed to present, by his offer of proof, adequate grounds for a change of judge for cause, there was no error in Judge Druke's failure to rule thereon and no error in allowing Judge Fisher to rule on the motion to vacate.

As to appellant Donahoe the judgment and sentence are affirmed. The sentences of appellants Lovell and Papadinis are modified by striking therefrom that part which requires payment of a fine. Their judgments of conviction and sentences, as modified, are affirmed.

HATHAWAY and RICHMOND, JJ., concur.